UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:14-CV-00034-GNS-HBB


SIERRA ENTERPRISES INC., et al.                                    PLAINTIFFS


v.


SWO & ISM, LLC, et al.                                             DEFENDANTS


**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's Motion to Exclude Plaintiffs' Expert Witness (DN 208); Defendant's Motion for Summary Judgment (DN 207), and Plaintiffs' Motion for Leave to File Sur-Reply (DN 219). The motions are ripe for adjudication. For the following reasons, Defendant's Motion to Exclude Plaintiffs' Expert Witness is **DENIED**; Defendant's Motion for Summary Judgment is **DENIED IN PART** and **GRANTED IN PART**, and Plaintiffs' Motion for Leave to File Sur-Reply is **GRANTED**.

## I.    BACKGROUND

In 2009, David Lewis ("Lewis") and Monica Ticer ("Ticer") formed Insight Management, LLC ("Insight"), which was engaged in the business of soliciting investors over the phone to purchase real estate in Georgia. (Ticer Dep. 47:15-24, 43:19-24, Feb. 25, 2015, DN 212-1). Also around 2009, Ticer and Lewis began working in the oil and gas business with FHE Energy. Lewis worked as a promotor and driller, while Ticer performed administrative work. (Ticer Dep. 60:25-61:4).

In 2010, Ticer and Lewis' relationship with FHE Energy ended, and the pair, through Insight formed Graybar & Associates, LLC ("Graybar") for the purpose of forming joint

1

ventures to drill oil wells.  (Ticer Dep. 57:15-58:1, 64:18-23).  The original members of Graybar were Greylon White and Insight.  (Ticer Dep. 61:25-63:16; 65:25-66:9).  Subsequently, Insight and Steve Wallace ("Wallace") formed SWO & ISM, LLC for the purpose of conducting the oil drilling operations and managing the joint ventures.  (Ticer Dep. 119:20-25).

In 2010, Graybar began soliciting investors for their oil drilling business.  (Ticer Dep. 78:23-25).  Investors were offered "participation units" which would purportedly entitle the investor to a percentage of working interest in the oil wells.  (Callicotte Report 16, DN 213-1; Pls.' Resp. Def.'s Mot. Exclude Expert Witness Ex. D, at 26, DN 213-4 [hereinafter Gentry PPM]).  The joint ventures were organized in such a manner that the purchasers had to rely on the efforts of the operator/managing joint venturer—either Graybar or SWO & ISM—to actually operate the oil and gas property.  (Callicotte Report 16).

In the course of soliciting investors, Graybar sent to potential investors various Private Placement Memoranda ("PPM").  (Gentry PPM; Pls.' Resp. Def.'s Mot. Summ. J. Ex. K, DN 211-12 [hereinafter Littrell PPM]).  The PPMs touted the experience of the principals involved but omitted any discussion of risk beyond the investor's capital contribution.  (Littrell PPM; Gentry PPM 3).  Plaintiffs' expert, Harry D. Callicotte ("Callicotte"), opines that this is a blatant misrepresentation of the risks associated with the purchasing of working interests in oil and gas ventures.  (Callicotte Report 7-8).  For example, according to Callicotte if the wells were to require more work than anticipated, or be destroyed, the costs for continuing operations would be borne entirely by the working interest owners; however, the PPMs did not mention such risk. (Callicotte Report 7-8).  Callicotte opines that these are standard risks in the oil and gas industry which should have been disclosed in the PPMs.  (Callicotte Report 7-8).

The PPMs also offered to sell 100% of the working interest in the wells. (Gentry PPM 4). Callicotte opines that it is highly unusual that one would sell 100% of such working interest. (Callicotte Report 8-9). According to Callicotte, by selling 100% of the working interest in the wells that were already producing, Graybar divested itself of any liability as a working interest owner and thus Graybar and SWO & ISM had no incentive to pursue continued production of these wells. (Callicotte Report 8-9).

Furthermore, the PPMs provided production estimates to potential investors of 30 barrels of crude oil per day based on past production records and a "48-hour daily test" that was conducted. (Gentry PPM 7-8). Wallace signed the "affidavit of production" that was attached to the PPM attesting to the probability that this amount of oil would be produced. (Wallace Dep. 134:2-137:23, Feb. 25, 2015, DN 213-5; Gentry PPM 7-8). Callicotte opined that despite his extensive experience in the oil and gas industry, he had never heard of the type of 48-hour daily test described in the PPM. (Callicotte Report 12). Moreover, he expressed the opinion that the advertisement of an agreed amount of production in the PPMs is highly unusual and inappropriate under industry standards. (Callicotte Report 12).

Greylan Gentry contacted Plaintiff William Peterson ("Peterson") to solicit investments for a joint venture created by Graybar. (Am. Compl. ¶ 39, DN 60). Peterson decided to invest in the joint venture and issued an initial check to Graybar on February 10, 2011, in the amount of $28,350.00. (Am. Compl. ¶ 40). Peterson continued his business relationship and invested in additional joint ventures with Graybar. (Am. Compl. ¶ 40). Peterson and his company, Sierra Enterprise, LLC, (collectively "Plaintiffs"), eventually invested a total of $955,225 in the joint ventures.

Plaintiffs entered into various contracts with the Defendants.[1]  (Am. Compl. ¶¶ 40, 52, 59, 62, 68, 74).  In their Verified Amended Complaint, Plaintiffs allege that they were not paid proper distributions under these contracts and that numerous misrepresentations and omissions were made in the disclosure memoranda that induced them into signing the agreements.  (Am. Compl. ¶¶ 40, 52, 59, 62, 68, 74).

KRS 353.205 requires that the Department of Revenue ("DOR") submit statistics on crude oil as reported to the DOR under the crude oil tax requirements of KRS Chapter 137.  According to Callicotte, the DOR received no reports of oil produced from any of the identified wells by any of the operators identified in the PPMs—Wallace Well Service, Hein Oil Company, Inc., or SWO Drilling—for the years 2010, 2011, and 2012.  (Callicotte Report 11; T. Lewis Dep. 170-71, Oct. 14, 2015, DN 211-2).  No run tickets demonstrating that oil was being produced have been provided from the transportation companies—Coomer Transport, and Hein Oil Gathering and Transport Company, LLC (now Lewis Oil Transportation, LLC ("Lewis Oil"))—although Ticer testified that these records were kept.  (Ticer Dep. 280:6-25; Notice Intent Serve Subpoena, DN 132).

As Defendants were having issues with oil getting picked up in a timely fashion, Lewis suggested that they form a transportation company.  (Wallace Dep. 150:9-14).  Solicitations were then made to the joint venture participants to invest money to purchase a transportation company.  (Wallace Dep. 162:17-22; Ticer Dep. 182:1-9; Pls.' Resp. Ex. O, at 4, DN 211-16).  Lewis Oil's predecessor was formed when Coomer Transportation was purchased.  (Ticer 176:11-178:8).  Callicotte opines that the Lewis Oil operation allowed Defendants to fully

---

[1] These agreements include:  Ronnie Gray Joint Venture Agreement; Wisdom Joint Venture Agreement; Participation Agreement; First Amendment; Carter Joint Venture Agreement; and Littrell Joint Venture Agreement.

control exploration, production, and transportation of any oil, as well as controlling the flow of money and recordkeeping among those entities. (Callicotte Report 13). Callicotte further stated that this insulated record-keeping is highly unusual in the oil and gas industry and allowed for manipulation of information. (Callicotte Report 13).

Bank records show a series of transfers in 2012-13 from SWO & ISM into Lewis Oil's bank account totaling $1,826,930.41. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. I, at 26-30, DN 211-10 [hereinafter Bank Records]). The funds were transferred in twelve transactions, the largest amounting to $950,000. (Bank Records 26-30). Although Ticer contends that accounting records explaining some of these transfers are in the possession of Lewis Oil, there are no detailed records in evidence explaining the purpose of the transfers. (Ticer Dep. 180:1-17).

Plaintiffs filed their Complaint against Defendants Graybar and SWO & ISM on March 5, 2015. (Compl., DN 1). Graybar failed to respond to the Complaint and Default Judgment was entered against it on April 15, 2014. (Default J., DN 19). In the Amended Complaint, Plaintiffs added as Defendants, Hein Oil Company, Inc.; Hein Oil Well Services, LLC; Insight; SWO, LLC; Wallace; Ticer; and Lewis Oil. (Am. Compl., DN 60). Subsequently, Plaintiffs settled with all Defendants except for Lewis Oil. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. M, DN 211-14 [hereinafter Settlement Agreement]). Five causes of action remain against Lewis Oil: (i) Count 33 - piercing the corporate veil; (ii) Count 34 – aiding and abetting; (iii) Count 35 – interference with business relations; (iv) Count 35 – fraudulent conveyances; and (v) Count 36 – enforcement of order. (Am. Compl. ¶¶ 262-287).

In the pending motions, Lewis Oil has moved for summary judgment on Plaintiffs' claims against it. (Def.'s Mot. Summ. J., DN 207). Lewis Oil has also moved to exclude the expert testimony of Callicotte, and Plaintiffs has sought leave to file a sur-reply to Lewis Oil's

summary judgment motion. (Def.'s Mot. Exclude Expert Witness, DN 208 [hereinafter Def.'s Mot. Exclude]; Pls.' Mot. File Sur-Reply, DN 46). Thus, this matter is ripe for adjudication.

## II. JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.00.

## III. DISCUSSION

### A. Defendant's Motion to Exclude Plaintiffs' Expert Witness

Rules 702 and 104(a) of the Federal Rules of Evidence govern the admissibility of expert testimony. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert*, Rules 702 and 104(a) require that the trial court act as a gatekeeper and ensure that expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589; *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002). The test for relevancy is one of "fit," meaning the testimony must be sufficiently related to the facts of the case such that it will

aid the trier of fact in understanding the evidence or determining a fact in issue. *Daubert*, 509 U.S. at 591.

When determining reliability, a key consideration for the trial court in carrying out its gatekeeping function is "whether the reasoning or methodology underlying the testimony is sufficiently valid . . . ." *Daubert*, 509 U.S. at 592-93. The Supreme Court, however, has advised that the inquiry is flexible and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95. There is no definitive checklist for determining whether an expert's testimony is reliable, but *Daubert* outlines factors for courts to consider, such as: (1) whether the theory or method in question "can be (and has been tested)"; (2) whether it "has been subjected to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Id.* at 593-94.

*Daubert* applies to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The listed factors, however, are not exhaustive. *See id.* Moreover, where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline." *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592). *Daubert* involves balancing the desire to liberally admit relevant evidence against the necessity of excluding misrepresentative "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).

While the trial court is not required to hold a *Daubert* hearing to determine the admissibility of expert testimony, it must ensure that the testimony is both relevant and reliable.

*See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000); *Nelson*, 243 F.3d at 248-49 (citing *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999)). Ultimately, "a trial judge . . . ha[s] considerable leeway in deciding whether particular expert testimony is reliable," and the decision is reviewed for abuse of discretion. *Kumho Tire*, 526 U.S. at 142, 152; *Conwood*, 290 F.3d at 792; *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolutely certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citation omitted) (citation omitted)).

As an initial matter, Lewis Oil's motion to exclude Plaintiffs' expert witness does not contest that Callicotte is qualified to opine on the standards, customs, and practices in the oil and gas industry. Callicotte has a B.S. in Petroleum Engineering from the University of Kansas; an MBA in Management from the University of Texas-Permian Basin, and a J.D. from the University of Missouri, Kansas City. (Callicotte Report 2). He has participated in significant continuing education courses related to petroleum and natural gas certification, reservoir engineering, product engineering, and petroleum management. (Callicotte Report 2). Callicotte is a thirty-five-year member of the Society of Petroleum Engineers, of which he previously served as the Chair of the East Kentucky Section, is a member of the Kansas Independent Oil and Gas Association, and a member of the Kentucky Oil and Gas Association. (Callicotte Report 2). He has been a licensed Professional Engineer since 1988. (Callicotte Report 2). Callicotte's qualifications would certainly qualify him as an expert generally in matters related to the oil and gas drilling business.

Lewis Oil contends that Callicotte's testimony is irrelevant because many of his opinions do not relate specifically to Lewis Oil. (Def.'s Mot. Exclude 2-3). For example, Lewis Oil posits that Callicotte's opinion regarding misstatements made during the course of the joint ventures were not made by Lewis Oil. Additionally, Lewis Oil argues that Callicotte's opinion concerning fraudulent operation of the wells is irrelevant because Lewis Oil was not the operator (Def.'s Mot. Exclude 2-3).

Lewis Oil's argument misses the mark, as Plaintiffs allege that Lewis Oil aided and abetted breaches of fiduciary duty and fraud by other parties. To prevail on these claims, Plaintiffs must show that Lewis Oil:

> (a) [performed] a tortious act in concert with [] [another] or pursuant to a common design with [it], or (b) [knew] that the other's conduct constitutes a breach of duty and [gave] substantial assistance or encouragement to the other so to conduct [itself], or (c) [gave] substantial assistance to the other in accomplishing a tortious result and [its] own conduct separately considered, constitute[d] a breach of duty to the third person.

*Farmer v. Newport*, 748 S.W.2d 162, 164-65 (Ky. App. 1988) (citing Restatement (Second) of Torts § 876). Thus, in order to establish an aiding and abetting claim, it is necessary for Plaintiffs to establish an underlying tort or claim that Lewis Oil has "aided and abetted." As such, the Plaintiffs have the right to present evidence respecting the actions of the other individuals and entities involved in the common scheme at issue in this case. *See Peoples Bank of N. Ky., Inc.*, 277 S.W.3d at 261 (recognizing a claim where "defendants acted tortuously pursuant to a common design[] or . . . rendered substantial assistance to others to accomplish the tortious act.").

Callicotte's testimony respecting how and by whom production records are normally kept in the oil and gas industry and his testimony explaining how the control of Lewis Oil could be used to conceal true production, or the lack of production, could aid the jury in determining

whether Lewis Oil provided Graybar and SWO & ISM with substantial assistance in breaching their fiduciary duties owed to Plaintiffs and committing fraud. Callicotte's opinions related to material misstatements and omissions could establish the scheme with which Lewis Oil was allegedly involved.[2] Therefore, the Court holds that Callicotte's opinions could be relevant to Plaintiffs' claims.

Lewis Oil argues that Callicotte's opinions are not supported by sufficient facts and data. (Def.'s Mot. Exclude 2-4). Yet, the "facts" Lewis Oil cites to contradict Callicotte's opinions merely reflect factual disputes in the record. Expert testimony will not be excluded because a party alleges a factual dispute. *Daubert*, 509 U.S. at 596. Rather, the Supreme Court has stated that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citation omitted). *See also Smith v. Carbide & Chems. Corp.*, No. 5:97-CV-3-M, 2009 WL 5184342, *9-10 (W.D. Ky. Dec. 21, 2009) (holding that the existence of potentially contrary facts are "a proper matter for cross-examination, but does not render [the expert's] opinions unreliable."); *Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 861 (E.D. Ky. Dec. 6, 2013) (finding that whether an appraisal adequately took into account the specific characteristics of the disputed property is a challenge that goes "to the weight of [the expert's] testimony, not its admissibility"). To the extent the Lewis Oil contends that there are factual disputes related to Callicotte's opinions, such disputes are not a basis for excluding the Callicotte's opinion, but are issues Lewis Oil is entitled to raise at trial.

---

[2] As discussed below with respect to Plaintiffs' claims under KRS 292.480(4), Lewis Oil cannot be held responsible for misrepresentations and solicitations or other wrongful acts which occurred before its predecessor was purchased.

Finally, Lewis Oil contends that Callicotte's opinions are not derived from reliable principles and methods. (Def.'s Mot. Exclude 1). Although Lewis Oil does not explain how or why Callicotte's testimony is unreliable, the Court notes that industry-specific experts, such as Callicotte, are entitled to rely on their experience to form opinions as to whether actions taken are a gross deviation from the standard practices observed in their field. *See First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (affirming the admissibility of an expert's opinion regarding whether the plaintiff followed prudent banking practices where the expert's testimony was based on his "own practical experiences throughout forty years in the banking industry . . . ."); *Deere & Co. v. FIMCO Inc.*, No. 5:15-CV-105-TBR, 2017 WL 927235, at *8 (W.D. Ky. Mar. 8, 2017) (allowing experts in the agricultural equipment industry to give opinions based upon their existing knowledge and experience in the agricultural industry).

While *Daubert* identifies several factors to consider for determining whether an expert's opinion is based on an acceptable methodology, these factors were not meant to be a definitive list of factors that must be met in order for an expert's opinion to be deemed reliable and thus admissible. *Kuhmo Tire Co.*, 526 U.S. at 150-51. As the Sixth Circuit has made clear, "[i]n some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *First Tenn. Bank Nat'l Ass'n*, 268 F.3d at 335 (quoting *Kumho Tire Co.*, 526 U.S. at 150). Opinions formed through "practical experiences . . . in [a particular] industry . . . do not lend themselves to scholarly review or to traditional scientific evaluation." *Id.* But such evidence remains reliable under the guidelines established by *Daubert*, and the Sixth Circuit has unequivocally rejected arguments otherwise. *Id.* ("Consequently, we find no merit in First Tennessee's argument that Iorlano's testimony lacked sufficient indicia of reliability, and

therefore was inadmissible, under the guidelines established by *Daubert*."); *see also Kumho Tire Co.*, 526 U.S. at 147 (acknowledging that experts may tie observations to conclusions through the use of general truths derived from specialized experience).

Callicotte bases his opinions regarding the standards and practices in the oil and gas industry on his 35 years of experience in the industry. His report indicates that he thoroughly reviewed the record in forming his conclusions. (Callicotte Report 19). Therefore, Callicotte's opinions properly based on his review of the record and his extensive experience will not be excluded under *Daubert* on the basis of unreliability.

For the foregoing reasons, the Court holds that Callicotte's testimony will not be excluded. Accordingly, Lewis Oil's motion to exclude Plaintiffs' expert witness is denied.

**B.      Defendant's Motion for Summary Judgment**

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific

facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. Fed. R. Civ. P. 56(e) (affidavits opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"); *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

### 1.    *Aiding and Abetting*

Count XXXIV of the Amended Complaint seeks damages for the actions Lewis Oil took when it "aided and abett[ed] in and acted in concert or pursuant to a common design to engage in the actions" described in other counts of the Amended Complaint, including Counts VI-X (breach of fiduciary duties); Counts XI-XV (common law fraud); Counts XVI-XX (negligent misrepresentation); and Counts XXI-XXV (violations of KRS 292.480). (Am. Compl. ¶¶ 115-244, 273-75). Whether evidence exists in the record from which a reasonable jury could find that Lewis Oil aided and abetted others with respect to these claims will be explored in turn.

### a.    A reasonable jury could find that Lewis Oil aided and abetted breaches of fiduciary duties.

As the Sixth Circuit has previously held, Kentucky law "recognizes a claim for aiding and abetting tortious conduct, which covers fiduciary-breach claims." *Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (citing *Steelvest, Inc. v. Scansteel Serv.*

*Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991)). *See also Anderson v. Pine S. Capital, LLC*, 177 F. Supp. 2d 591, 604 (W.D. Ky. 2001) ("One may be held liable to an injured plaintiff for aiding and abetting a breach of a fiduciary duty." (citation omitted)).[3]

To prevail on this claim, Plaintiffs must show: (1) the existence and breach of a fiduciary duty; (2) the defendant gave the breaching party "substantial assistance or encouragement" in effectuating the breach; and (3) the defendant knew that the party's conduct breached that fiduciary duty. *Miles Farm Supply, LLC*, 595 F.3d at 666 (citations omitted). Defendant contends that Plaintiffs' aiding and abetted breaches of fiduciary duty claim cannot survive because "the proof in the case at bar to date does not support any of the prongs in this test as having been met . . . ." (Def.'s Mot. Summ. J. 22, DN 207). Specifically, Defendant asserts that there is no evidence of substantial assistance or actual knowledge on its part. (Def.'s Mot. Summ. J. 22).

---

[3] Lewis Oil argues that Kentucky does not recognize a claim for aiding and abetting a breach of fiduciary duty. (Def.'s Reply Mot. 7, DN 215 [hereinafter Def.'s Reply]). In support, Lewis Oil asserts that *Peoples Bank of Northern Kentucky, Inc. v. Crowe Chizek & Company*, LLC, 22 S.W.3d 255 (Ky. App. 2008), and *Farmer v. Newport*, 748 S.W.2d 162 (Ky. 1988), cases cited by Plaintiffs, actually analyze a claim of civil conspiracy and not aiding and abetting. (Def.'s Reply 7). This Court has held that "there is no legal distinction between aiding and abetting a breach of a fiduciary duties and a civil conspiracy to breach fiduciary duties" as both claims involved the exact same elements. *Cmty. Ties of Am., Inc. v. NDT Care Servs.*, LLC, No. 3:12-CV-00429-CRS, 2015 WL 520960, at *17 (W.D. Ky. Feb. 9, 2015) (citing *Steelvest*, 807 S.W.2d at 485). This Court has also referred to such a claim as "aiding and abetting a breach of fiduciary duty—civil conspiracy." *Stanley Warranty, LLC v. Universal Adm'rs Serv., Inc.*, 3:13-CV-513-JGH, 2014 WL 4805669, at *1 (W.D. Ky. Sept. 26, 2014). Significantly, when analyzing similar arguments, a sister court has held that such a claim under Kentucky law is appropriately analyzed as an aiding and abetting claim. *Gundaker/Jordan Am. Holdings, Inc. v. Clark*, Civ. No. 04-226-JBC, 2008 WL 4550540, at *4 (E.D. Ky. Oct. 9, 2008). The court in *Gundaker* called into question *Peoples Bank of Northern Kentucky, Inc. v. Crowe Chizek and Company, LLC*, 22 S.W.3d 255 (Ky. App. 2008), for ignoring the Kentucky Supreme Court's decision in *Steelvest*, which explicitly recognized a claim for aiding and abetting the breach of a fiduciary duty. *Id.* at *4 (citing *Steelvest*, 807 S.W.2d at 485). Therefore, Lewis Oil's argument that Kentucky law does not recognize claims for aiding and abetting breaches of a fiduciary duty is rejected.

###### i.        *Existence and Breach of a Fiduciary Duty*

First, Lewis Oil contends that it could not have breached any duty to Plaintiffs because it did not owe any such duty.  (Def.'s Reply 8 (citing *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650 (E.D. Ky. 2009))).  Plaintiffs, however, are not claiming a breach of fiduciary duty owed to them by Lewis Oil, but are asserting that Lewis Oil aided and abetted a breach of a fiduciary duty by other parties.  An examination of the elements for aiding and abetting breach of a fiduciary duty demonstrate that it is not Lewis Oil who must owe and breach a fiduciary duty. The test only requires that Lewis Oil gave the party who did breach a fiduciary duty "substantial assistance" with knowledge that the party's conduct breached such fiduciary duty.  *Miles Farm Supply, LLC*, 595 F.3d at 666 (citing Restatement (Second) of Torts § 876).

Lewis Oil cites to *CASS JV, LLC v. Host International, Inc*., No. 3:12-CV-00359-CRS-DW, 2014 WL 3955366 (W.D. Ky. Aug. 13, 2014), where the court concluded that the plaintiffs' aiding and abetting a breach of fiduciary duty claim failed as a matter of law because the underlying breach of fiduciary duty claim failed.  *CASS JV, LLC*, 2014 WL 3955366, at *7. There is nothing in *CASS JV* that would indicate that the alleged aider and abetter must owe an independent fiduciary duty to the plaintiff.  *See also Cmty. Ties of Am., Inc.*, 2015 WL 520960, at *17 ("To prevail, [the plaintiff] must show the following:  1). that [another defendant] breached his fiduciary duties; 2). that the Clevenger Defendants gave 'substantial assistance or encouragement' to him; and, 3). that the Clevenger Defendants 'kn[ew] that [Stephen's] conduct' breached a fiduciary duty.'"  (citing *Miles Farm Supply, LLC*, 595 F.3d at 666)).  Accordingly, the Court rejects the argument that Lewis Oil must have owed a fiduciary duty to Plaintiffs in order to survive summary judgment.

### ii.     *Substantial Assistance*

"Substantial assistance" means that a defendant's conduct was a substantial factor in causing the tort. *Aetna Cas. & Sur. Co. v. Leahey Const. Co*., 219 F.3d 519, 537 (6th Cir. 2000) (citing Restatement (Second) of Torts § 876).  The comments to Section 876 of the Restatement (Second) of Torts list factors to consider when determining whether substantial assistance has been provided:  "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind."  *Id*. (citation omitted).  The Court concludes that there is sufficient evidence to conclude that Lewis Oil's alleged conduct was a "substantial factor" in perpetrating the breaches of fiduciary duty.  According to Callicotte:

> By purchasing the transportation company, which was to pick up oil from the subject leases, the Defendants were able to use HOG-T [Lewis Oil] to further conceal the lack of production of oil wells from the 2010 through 2012 period. The purchase of HOG-T allowed the Defendants to fully control exploration, production, and transportation of any oil, as well as controlling the flow of money and record-keeping among those entities.  By adding a transportation company to their scheme, the Defendants effectively removed any chance that a third party could generate any records that would otherwise demonstrate the actual levels of production, if any.  . . . Such insulated record-keeping is highly unusual and allowed for the manipulation of information.  It is my opinion therefore that the purchase of HOG-T was for the purpose of continuing to perpetuate the fraud on the joint venture investors, and to further insulate the Defendants from any discovery of such fraud.

(Callicotte Report 13-14).  Based upon Callicotte's opinion, a reasonable jury could certainly conclude that Lewis Oil's actions were a substantial factor in the other Defendants' breaches of fiduciary duties, due to Lewis Oil's control over the transportation records which helped conceal the alleged fraud.

### iii. *Actual Knowledge*

Although "actual knowledge" is required, "the requisite intent and knowledge may be shown by circumstantial evidence." *Aetna Cas. & Sur. Co.*, 219 F.3d at 535-36 (internal quotation marks omitted). Viewing the facts most favorable to Plaintiffs, a reasonable jury could conclude that Lewis Oil was aware of the alleged fraudulent scheme, as the scheme was perpetrated by the group of Wallace, Ticer, and Lewis. "A corporation can act only through its servants, agents or employees . . . ." *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 736 (Ky. App. 2004). Under basic agency law, the company is charged with notice of facts that its agent knows or has reason to know. *Ill. Cent. R. Co. v. Fontaine*, 289 S.W. 263, 267 (Ky. 1926). As the perpetrators of the alleged scheme are the same principals who created Lewis Oil to mask the scheme, a jury could infer that Lewis Oil was aware of the existence of fiduciary duties and the subsequent breach of those duties through the fraud. The Court concludes that Plaintiffs' claims against Lewis Oil for aiding and abetting breaches of fiduciary duties create triable factual issues. Therefore, Lewis Oil's motion for summary judgment as to these claims is denied.

### b. A reasonable jury could find that Lewis Oil aided and abetted common law fraud.

"Aiding and abetting tortious conduct, including fraud, is a recognized claim in Kentucky." *Great Am. Ins. Co. v. Poynter*, No. 110-CV-00161-JHM, 2013 WL 1181445, at *4 (W.D. Ky. Mar. 20, 2013) (citing *Lappas v. Barker*, 375 S.W.2d 248, 252 (Ky. 1963)). Just as with fiduciary duties, "[t]o prove that a party aided and abetted fraud, a plaintiff must show that the defendant gave 'substantial assistance or encouragement' to the person who committed fraud and that the defendant knew of the wrongful conduct." *Id.* (citing *Miles Farm Supply*, 595 F.3d at 666).

Fraud consists of the following elements: (i) a material representation; (ii) which is false; (iii) that is known to be false or made recklessly; (iv) that is made with inducement to be acted upon; (v) that the plaintiff acts in reliance thereon; and (vi) that the plaintiff is injured. *UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (citing *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. App. 1978)).

As Plaintiffs' aiding and abetting a breach of fiduciary duty claim is based upon the alleged fraud perpetrated by Lewis Oil, the analysis is much the same. As discussed above, there is sufficient evidence to allow a reasonable jury to conclude that Lewis Oil "substantially assisted" Defendants in perpetrating the fraud, as Plaintiffs' expert concludes that Lewis Oil was used to insulate Defendants' records to further conceal the fraud. Lewis Oil argues that there is no evidence in the record to prove that Lewis Oil substantially assisted the fraud because Lewis Oil was not in existence at the time that Plaintiffs made their original investment. (Def.'s Reply 9). Although Lewis Oil was not in existence at the time of Plaintiffs' initial investment, Plaintiffs' expert opines that Lewis Oil was created "for the purpose of continuing to perpetuate the fraud on the joint venture investors, and to further insulate the Defendants from any discovery of such fraud." (Callicotte Report 13-14). The fact that Lewis Oil was created after Plaintiffs' investments were made is of no consequence. Accordingly, there is evidence in the record to support a finding that Lewis Oil aided and abetted the settling Defendants' fraudulent scheme.

Further, as the operators of Lewis Oil were the same individuals who allegedly orchestrated the fraudulent scheme, a reasonable jury could certainly conclude that Lewis Oil was aware of the fraud. (Pls.' Resp. Ex. O, at 4). Therefore, the Court holds that Plaintiffs'

aiding and abetting fraud claim survives summary judgment and Lewis Oil's motion for summary judgment as to this claim is denied.

**c.**      **A reasonable jury could find that Lewis Oil aided and abetted a negligent misrepresentation**

As a threshold matter, it is uncertain whether aiding and abetting a negligent misrepresentation is a tort that exists under Kentucky law. The Court can find no Kentucky cases either supporting or refuting the proposition that aiding and abetting liability can exists for acts of negligence, although it is clear that aiding and abetting liability reaches fraudulent or intentional torts. *See Lappas*, 375 S.W.2d at 252 ("Aiding and abetting tortious conduct, including fraud, is a recognized claim in Kentucky."). Kentucky follows the Restatement (Second) of Torts § 876 in considering claims of aiding and abetting tortious conduct. *See Miles Farm Supply, LLC*, 595 F.3d at 666. Pointedly, the Restatement (Second) of Torts permits aiding and abetting liability "both when the act done is [intentional] and when it is merely a negligent act." Restatement (Second) of Torts § 876(b) cmt. d. *See also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 767 (S.D. Tex. 2005) (holding that Connecticut law recognized a common law claim for aiding and abetting negligent torts because Connecticut law based its aiding and abetting liability claims on section 876(b) of the Restatement (Second) of Torts). Kentucky law also recognizes criminal liability for aiding and abetting a negligent act. *Birmingham v. Commonwealth*, 503 S.W.2d 499, 503 (Ky. 1972) ("We do not question that a person may be found guilty of aiding and abetting another person in the crime of involuntary manslaughter under KRS 435.022(1) or (2) by reckless or wanton conduct in the operation of an automobile."). *See also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, No. 02-CV-8881(JPO), 2017 WL 1207836, at *19 (S.D.N.Y. Mar. 31, 2017) (emphasizing that New York law recognizes criminal liability for aiding and abetting negligent conduct when holding

the New York law recognizes a common law claim for aiding and abetting a negligent misrepresentation) (citation omitted). Thus, it appears Kentucky courts would recognize the tort of aiding and abetting a negligent misrepresentation.

If the settling Defendants' conduct amounted to a negligent misrepresentation, and Lewis Oil knew and substantially assisted those Defendants in doing so, then Lewis Oil aided and abetted a negligent misrepresentation. *See Miles Farm Supply, LLC*, 595 F.3d at 666. A negligent misrepresentation claim is defined as:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004) (adopting Restatement (Second) of Torts § 552(1)). Here, there is enough evidence for Plaintiffs to proceed on their theory of aiding and abetting negligent misrepresentations. As discussed above in the context of the aiding and abetting fraud claim, there is evidence to support a finding that Lewis Oil was aware of and substantially assisted in the misrepresentations that were made to Plaintiffs. Whether those misrepresentations were fraudulent or negligent is a question to be sorted out by the jury. For summary judgment purposes, Plaintiffs' aiding and abetting negligent misrepresentation claim survives. Accordingly, Lewis Oil's motion for summary judgement as to the aiding and abetting negligent misrepresentation claim is denied.

### d. Plaintiffs' claim that Lewis Oil aided and abetted violations of KRS 292.480 fails as a matter of law.

Plaintiffs' Counts XXI-XXV seek damages against Lewis Oil for aiding and abetting violations of KRS 292.480.[4] This Court has held that KRS 292.480(4), unlike federal securities laws, "impos[es] aiding and abetting liability on those who materially assist others in violating the state's securities laws." *Clayton v. Heartland Res., Inc*., 754 F. Supp. 2d 884, 897 (W.D. Ky. 2010). In relevant part, the statute provides states that "every . . . *agent who materially aids in the sale or purchase* is also liable jointly and severally with and to the same extent as the seller or purchaser . . . ." KRS 292.480(4) (emphasis added). The term "agent" is statutorily defined as "any individual other than a broker-dealer who represents a broker-dealer or issuer *in effecting or attempting to effect purchases or sales of securities* . . . ." KRS 292.310(1) (emphasis added). "[T]o be considered to have effected or attempted to effect the purchase or sale of securities he or she must have actively assisted in offering securities for sale, solicited offers to buy, or actually performed the sale." *Clayton*, 754 F. Supp. 2d at 897 (citation omitted).

Plaintiffs contend that because Lewis Oil does not dispute that there was a violation of KRS 292.480(1) and because the securities were sold by means of material misrepresentations which Lewis Oil was created to cover up, Lewis Oil aided the securities violation. (Pls.' Resp.

---

[4] In addition, KRS 292.480(1) provides:

> Any person, who offers or sells a security in violation of this chapter or of any rules or orders promulgated hereunder or offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security . . . .

KRS 292.480(1).

27-28).  Lewis Oil responds that this claim fails as a matter of law because there is no evidence that Lewis Oil "made any representations to the Plaintiffs, issued any securities or assignments to the Plaintiffs, had any assets of the Plaintiffs transferred to it by the settling Defendants, or participated in any way in the original settlement agreement with the Plaintiffs . . . ."  (Def.'s Mot. Summ. J. 23).  Further, Lewis Oil argues that "what is material is that Lewis Oil did not sell or solicit any sale of an investment to the Plaintiffs and that [Plaintiffs] did not purchase any investment promoted by Lewis Oil."  (Def.'s Reply 10).

Plaintiffs' use of aiding and abetting liability under KRS 292.480(4) stretches that concept beyond its reach.  In *Clayton v. Heartland Resources, Inc*., this Court that "[t]he only Kentucky court to issue an opinion as to liability under § 292.480(4) held that 'any person who *facilitates* another person's securities fraud becomes vicariously liable absent an affirmative demonstration of good faith.'"  *Clayton*, 752 F. Supp. 2d at 897 (emphasis added) (citing *Senior Healthcare Ins. & Fin. Serv., Inc. v. Clementi*, No. 2006-CA-001348-MR, 2007 WL 1784158 (Ky. App. June 8, 2007)).  Because the Kentucky case law had not yet laid out the framework for determining when a person has facilitated another person's securities fraud, the Court in *Clayton* predicted Kentucky courts would hold that an attorney for the seller of securities did not fit the definition of an agent in the statute because he did not "actively assist[] in offering securities for sale . . . ."  *Id*. at 898 (citation omitted).

The evidence of record does not support the contention that Lewis Oil was an agent of Defendants under the Kentucky's securities statute; there is no evidence to show that Lewis Oil actively assisted in the offering of the securities for sale with respect to the joint venture created before Lewis Oil's predecessor was purchased.  *See id.* at 897-98.  In fact, since the sale of the subject securities was completed before Lewis Oil (or its predecessor) was created, Lewis Oil

could not have "materially aid[ed] in the sale or purchase" of securities. KRS 292.480(4). Thus, Lewis Oil cannot be not liable under KRS 292.480(4).

Plaintiffs contend that they could also recover from Lewis Oil for aiding and abetting Defendants' statutory violations of KRS 292.480 under KRS 446.070.[5] (Pls.' Resp. 27-28). KRS 292.480 codifies the concept of negligence per se. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011). Plaintiffs offer no support for their argument that KRS 446.070 should apply to Kentucky's securities fraud statute, which creates its own civil remedies. Nor do Plaintiffs provide any support for the theory that aiding and abetting liability should apply to KRS 446.070. Moreover, even if Plaintiffs could proceed under this theory, KRS 292.480 deals with fraud in the *sale* of securities. Lewis Oil was not in existence when the securities were sold. Therefore, it cannot be said that Lewis Oil substantially assisted in those sales to give rise to aiding and abetting liability. Thus, the Court finds that Plaintiffs' alternative theory argument to no avail.

Accordingly, the Court holds that Plaintiffs' aiding and abetting violations of KRS 292.480 fail as a matter of law and Defendant's motion for summary judgment as to this claim is granted.

### 2. *Contract Interference/Aiding and Abetting Breaches of Contract*

Count XXXV of the Amended Complaint seeks damages for the actions Lewis Oil took when it "intentionally interfered with the valuable and established contractual relationships (existing and expected) between Plaintiffs, Graybar, and SWO & ISM." (Am. Compl. ¶ 277).[6]

---

[5] KRS 446.070 provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

[6] Similarly, Count XXXIV and its reference to Counts I-V (breach of contract) seek damages for Lewis Oil's aiding and abetting breaches of contract.

The claim for tortious interference with a contract has six elements: (1) the existence of a contract; (2) knowledge of the contract; (3) intent to cause a breach of that contract; (4) breach of the contract caused by the defendant's actions; (5) damages; and (6) an absence of privilege or justification to excuse Defendant's conduct. *Snow Pallet, Inc. v. Monticello Banking Co*., 367 S.W.3d 1, 5-6 (Ky. 2012) (citing *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc*., 635 F. Supp. 2d 612, 619 (W.D. Ky. 2009)).[7]

Lewis Oil argues that Plaintiffs have not "alleged what contracts were breached nor have the Plaintiffs identified any evidence of a motive or intent . . . ." (Def.'s Mot. Summ. J. 24). To the contrary, Plaintiffs fully identified each of the contracts at issue in their Complaints. (Am. Compl. ¶¶ 40, 52, 59, 62, 68, 74).[8] Furthermore, Lewis Oil's knowledge of the contracts is more than "unbiased assumptions" as Lewis Oil was controlled by the same individuals who participated in the formation of the contracts. (Pls.' Resp. Ex. O, at 4). There is sufficient evidence in the record that would lead a reasonable jury to conclude that the contracts were breached. *See CMI, Inc. v. Intoximeters, Inc*., 918 F. Supp. 1068, 1079 (W.D. Ky. 1995) (noting that an interference with contract action requires proof that the third-party breached the contract). Likewise, there is evidence indicating that the settling Defendants failed to make proper distributions to Plaintiffs as promised in the agreements. (Am. Compl. ¶ 45).

---

[7] Under Kentucky law, a claim for interference with a contractual relationship does not require special damages, as Lewis Oil contends. (Def.'s Mot. Summ. J. 24). A claim for tortious interference with a prospective business relationship does require special damages; however, that claim is not the issue here. *Snow Pallet, Inc*., 367 S.W.3d at 6 (citing *Monumental Life Ins. Co. v. Nationwide Ret. Sols., Inc*., 242 F. Supp. 438, 450 (W.D. Ky. 2003)).

[8] Lewis Oil contends that there is no evidence of any contract because the contracts are not of record as exhibits. Plaintiffs have directed the Court's attention to the Verified Amended Complaint as evidence of the contracts existence. (Am. Compl. ¶¶ 40, 52, 59, 62, 68, 74). This is sufficient evidence to survive summary judgment as to this point. *See* Fed. R. Civ. P. 56(e).

Lewis Oil insists that there is no evidence that it possessed the requisite intent to cause the breach of the contracts. (Def.'s Mot. Summ. J. 24; Def.'s Reply 11). The Restatement (Second) of Torts, which Kentucky has adopted for interference claims, defines "intent" as "denot[ing] the actor['s] desire to cause consequences of his act, or [his] belie[f] that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965); Restatement (Second) of Torts § 766 cmt j. (1979); *Lillard v. Univ. of Louisville*, No. 3:11-CV-00554-H, 2012 WL 5878715, at *4 (W.D. Ky. Nov. 21, 2012) (explaining that Kentucky has adopted the Restatement (Second) of Torts for interference claims). Intent may be shown by circumstantial evidence. *See Institutional Labor Advisors, LLC v. Allied Res., Inc*., No. 4:12-CV-00044-JHM, 2013 WL 6590124, at *7 (W.D. Ky. Dec. 16, 2013). In the present case, there is sufficient evidence to create a genuine issue of fact whether Lewis Oil intended the contracts between the settling Defendants and Plaintiffs be breached. Callicotte has opined that Lewis Oil was formed for the purpose of hiding the true amount of oil production of the joint ventures. (Callicotte Report 13-14). Clearly if Lewis Oil was created to conceal the settling Defendants' allegedly improper transactions, a jury could believe that Lewis Oil intended to take actions which breached the contracts between Plaintiffs and the settled Defendants. *See Institutional Labor Advisors*, *LLC*, 2013 WL 6590124, at *8.

Additionally, there is no evidence that Lewis Oil's alleged interference with Plaintiffs' contracts was justified or privileged. *See Snow Pallet, Inc*., 367 S.W.3d at 5-6 (citation omitted). Lewis Oil's argument that it could not have interfered with the contracts at issue because "it was not a part to any of these contracts" is not well taken. (Def.'s Mot. Summ. J. 21-22). The contention that one cannot be liable for interference with a contract if they are not a party to the

contract is contrary to the purpose of the tort, which presupposes third-party liability (as opposed to first-party breach of contract claims).

The Court finds that there are genuine issues of fact as to whether Lewis Oil "intentionally interfered with the valuable and established contractual relationships (existing and expected) between Plaintiffs, Graybar, and SWO & ISM." (Compl. ¶ 277). Lewis Oil's motion for summary judgment as to the interference with a contract claim is denied.

### 3.    *Fraudulent Conveyances*

Count XXXV of the Amended Complaint seeks damages for the actions Lewis Oil took when it received fraudulently conveyed assets in violation of KRS 378.010 and 020. (Am. Compl. ¶¶ 276-78). Under these statutes, fraudulent conveyance claims include claims of actual fraud (under KRS 378.010) and constructive fraud (under KRS 378.020).

KRS 378.010 provided that "[e]very gift, conveyance, assignment or transfer . . . made with the intent to delay, hinder or defraud creditors . . . *shall be void* as against such creditors." (emphasis added). Similarly, KRS 378.020 stated that "every gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate without valuable consideration therefor, shall be void as to all his then existing creditors. . . ."[9] This statute embraces the doctrine of constructive fraud, which "is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Combs v. Poulos*, 44 S.W.2d 571, 573 (Ky. 1913) (internal quotation marks omitted) (citation omitted). "Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive

---

[9] Although those statutes were repealed and replaced with the Uniform Voidable Transfers Act, KRS 378A, effective January 1, 2016, the actions at issue occurred prior to that date. The newly adopted Uniform Voidable Transfers Act did not repeal the then-existing statutes for violations committed while they were in effect. *See* KRS 446.110.

fraud." *Id.* (internal quotation marks omitted) (citation omitted). Lewis Oil asks the Court to dismiss this claim because: (1) the statutes at issue were repealed; and (2) an alleged lack of evidence to support the claim. Each of these reasons is without merit. (Def.'s Mot. Summ. J. 24-25).

Contrary to Lewis Oil's contentions, the Uniform Voidable Transfers Act specifically states that its repeal of prior law "shall not apply to: (1) A transfer made or obligation incurred before the effective date of this Act; or (2) A right of action that has accrued before January 1, 2016 . . . ." Act of Mar. 20, 2015, 2015 Ky. Acts ch. 37, § 18. Because all actions alleged by Plaintiffs occurred before January 1, 2016, Plaintiffs may proceed with their claims for violation of these statutes. *See CDK Glob., LLC v. Scott & Reynolds, LLC*, No. 1:14-CV-00045-JHM, 2017 WL 956594, at *5 (W.D. Ky. Mar. 10, 2017) ("KRS 378.010 and 378.020 have been repealed; however, that repeal was not effective until January 1, 2016, after all of the alleged fraudulent transfers, meaning that the statutes would apply to the conveyances in this case.").

Lewis Oil argues that "[t]he record would establish the lack of any transfers" to support this claim. (Def.'s Mot. Summ. J. 24). It further argues that the transfers that were made were for purposes of the settlement. (Def.'s Mot. Summ. J. 24). Contrary to Lewis Oil's assertions, bank records of Lewis Oil demonstrate that $1,826,930.41 was transferred from SWO & ISM to Lewis Oil in 2012-13. (Bank Records 26-30). Because these transfers were made prior to the inception of this litigation, the transfers were obviously not for the purposes of settlement as Lewis Oil contends.[10] (Bank Records 26-30; Def.'s Mot. Summ. J. 24).

---

[10] In the Amended Complaint, Plaintiffs allege that one of the fraudulent transfers was that of the Carter lease property to Wallace and Ticer. (Am. Compl. ¶ 281). In settling with these Defendants, Plaintiffs agreed that Wallace and Ticer could sell that property in order to partially fund the settlement. (Pls.' Resp. 28, n.136). Yet, this does not eliminate Plaintiffs' claim as to the additional transfers. (Def.'s Reply 16-17).

Because evidence of transfers between SWO & ISM and Lewis Oil have been identified in the record, the issue becomes whether these transfers demonstrate sufficient badges of fraud so that it "would be unreasonable . . . to find that the transfer was not fraudulent . . . ." *Russell Cty. Feed Mill, Inc. v. Kimbler*, 520 S.W.2d 309, 311 (Ky. 1975) (citations omitted). There are four generally recognized badges of fraud: (i) "the transfer or conveyance is between persons who are related or occupy a confidential relationship;" (ii) "the transfer or conveyance contains false statements and recitals of consideration, or inadequate consideration;" (iii) "the transfer or conveyance is made by a debtor in anticipation of a suit against him or after a suit has begun or is pending against him;" and (iv) "the transfer or conveyance is made by a debtor who transfers all or any appreciable part of his property when he is insolvent or financially embarrassed." *Id.* at 311-12 (internal citations omitted) (citation omitted); *Bank of Josephine v. Hopson*, 516 S.W.2d 339, 341 (Ky. 1974).

When viewing the facts most favorable to Plaintiffs, there is sufficient proof of badges of fraud present for Plaintiffs' claims to create a triable issue precluding summary judgment. First, SWO & ISM and Lewis Oil were related companies with common members. Despite Lewis Oil's contentions, the record establishes that there was much more to the relationship between Lewis Oil and SWO & ISM than that of a customer and a transportation services provider. During the period of the alleged fraudulent transfers, Wallace and Ticer were the principal owners of Lewis Oil's predecessor, and both Wallace and Ticer managed Lewis Oil. (T. Lewis Dep. 47:23-48:24; Ticer Dep. 83:1-84:25; Pls.' Resp. Ex. O, at 1-4). Further, Wallace penned the solicitation letter to investors to raise capital to purchase Lewis Oil and was listed on the letter as the "Operations Manager." (Pls.' Resp. Ex. O, at 1-4). Wallace was also a founding member of SWO & ISM. (Ticer Dep. 119:20-25). This Court has previously indicated that

while conveyances between companies with common members are "not the quintessential confidential relationship[,]" the relatedness of the two entities should still be considered. *CDK Glob., LLC*, 2017 WL 956594, at *7.

There is also evidence in the record indicating that the transfers were made for inadequate consideration. Ticer testified that she believed that the funds were transferred to Lewis Oil for the purpose of purchasing Coomer Oil; however, there are no records to demonstrate the purpose of the transfers to Lewis Oil, which amounted to almost $2 million. (Ticer Dep. 119:11-120:11). *See CDK Glob., LLC*, 2017 WL 956594, at *8 ("There is some doubt as to what these payments were for, which raises the possibility that there was inadequate consideration for these transfers."). Therefore, Plaintiffs have proffered enough evidence to demonstrate that badges of fraud may exist regarding the lack of consideration for the transfers from SWO & ISM to Lewis Oil.

Finally, there is at least an issue of fact that the transfers were made in anticipation of a lawsuit. The timing of the transfers could reasonably be viewed as suspect, as Lewis was indicted on charges of securities fraud in the United States District Court for the Northern District of Texas in June 2012. (Pls.' Resp. Ex. E, at 21-24, DN 211-5). Transfers were subsequently made from SWO & ISM to Lewis Oil throughout 2012-13. Plaintiffs contend that because Defendant's principals knew that fraud was being committed, the transfers were in anticipation of a future suit. Based on these facts, there appears to be genuine dispute as to whether these transfers were made with the intent to defraud Plaintiffs. Therefore, the motion for summary judgment as to these conveyances is denied.

### 4.    *Piercing the Corporate Veil*

Count XXXIII of Plaintiffs' Amended Complaint alleges that Lewis Oil's veil should be pierced. (Am. Compl. ¶ 272; Pls.' Resp. 30).  In Lewis Oil's motion for summary judgment, Lewis Oil argues that Lewis Oil's corporate veil should not be pierced because "the elements . . . that might otherwise lead to a cause of action for piercing the corporate veil of Lewis Oil to proceed do not exist[]."  (Def.'s Reply 13; Def.'s Mot. Summ. J. 15-16).  Lewis Oil argues that Plaintiffs' settlement with the other Defendants in this lawsuit defeats this claim against Lewis Oil.  Although Lewis Oil does not explain how this is so, the Court is inclined to agree.  (Def.'s Mot. Summ. J. 16).

First, under Kentucky law "the doctrine of piercing the corporate veil is recognized as being an equitable remedy, not a cause of action unto itself, which is used as a means of imposing liability."  *Hodak v. Madison Capital Mgmt*., 348 F. App'x 83, 94-95 (6th Cir. 2009) (internal quotation marks omitted) (quoting *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 211 (Ky. App. 2009)).  *See also In re RCS Engineered Prods. Co*., 102 F.3d 223, 226 (6th Cir. 1996) (applying Michigan law and noting that "an alter ego claim is not by itself a cause of action.").  Accordingly, there must be other parties in the action upon which to impose liability.  All remaining Defendants—SWO & ISM, Hein Oil Well Services, LLC, Insight, SWO, LLC, as well as Wallace and Ticer individually—entered into a settlement agreement with the Plaintiffs and all claims against them in this lawsuit were dismissed with prejudice.  (Order Granting Settlement & Release Agreement, DN 161).  It seems to make no sense to pierce the corporate veil of the entity when all other claims have been settled against the principals "behind the veil."

This Court has previously refused to apply the equitable remedy of piercing the corporate veil when those sought to be held liable were not parties to the lawsuit.  *See Sudamax Industria e*

*Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841, 848 (W.D. Ky. 2007) ("The Court finds that application of a veil piercing theory in the present case is difficult in light of the parties the Plaintiffs have sued. In arguing that veil piercing of Tantus is warranted, Plaintiffs' expert points to two entities, Progress Machinery & Russell County Holdings, through which he claims that Tantus is hiding assets. However, these two entities have not even been named as defendants."). *See also Nelson v. Adams USA, Inc.*, 529 U.S. 460, 463, 471 (2000) (holding that due process requires that a corporate officer or principal shareholder be given an opportunity to contest his personal liability for a judgment previously rendered against the corporation); *St. Croix Renaissance Grp., LLLP v. St. Croix Alumina, LLC*, No. 04-67, 2010 WL 4723897, at *2 (D.V.I. Nov. 18, 2010) ("While it is true that parent corporations can be held liable for the acts of their subsidiaries under certain circumstances, the parent corporation must at least be a party to the action. In fact, in each case plaintiffs cite in opposition to the pending motion, the parent corporation was a defendant. Here, Alcoa, Inc. is not a party and, as such, cannot be held liable . . . .").

Because the settling Defendants are no longer parties in this lawsuit and all claims against them have been dismissed with prejudice, the Court will not entertain a theory of piercing the corporate veil of Lewis Oil. *See Stahlex-Interhandel Tr., Reg. v. W. Union Fin. Servs. E. Europe Ltd.*, 115 F. App'x 462, 465 (2d Cir. 2004) (holding that the issue of piercing the corporate veil was moot because the claims against the subsidiary corporation had been dismissed with prejudice, thus, there was no one in the case to hold liable because piercing the corporate veil "'does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners.'" (quoting *Morris v. N.Y. State Dep't of Taxation & Fin.*, 623 N.E.2d

1157, 1160 (N.Y. 1993))). Accordingly, Lewis Oil's motion to preclude Plaintiffs' theory of corporate veil piercing is granted.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.      Defendant's Motion for Summary Judgment (DN 207) is **GRANTED IN PART** and **DENIED IN PART**;

2.      Defendant's Motion to Exclude Plaintiffs' Expert Witness (DN 208) is **DENIED**; and

3.      Plaintiffs' Motion to File Sur-Reply (DN 219) is **GRANTED**.

**Greg N. Stivers, Judge**
**United States District Court**
August 28, 2017

cc:     counsel of record